## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA

**KEATON HARGETT**, on behalf of himself and all others similarly situated,

Plaintiff,

v.

**NASCAR ENTERPRISES, LLC,**

Defendant.

No. 6:25-cv-1523

## CLASS ACTION COMPLAINT

## DEMAND FOR JURY TRIAL

Keaton Hargett ("Plaintiff"), through his attorneys, individually and on behalf of all others similarly situated, brings this Class Action Complaint against Defendant NASCAR Enterprises, LLC ("NASCAR" or "Defendant"), and its present, former, or future direct and indirect parent companies, subsidiaries, affiliates, agents, and/or other related entities. Plaintiff alleges the following on information and belief—except as to his own actions, counsel's investigations, and facts of public record.

### NATURE OF ACTION

1.     This class action arises from NASCAR's failure to protect highly sensitive data.

2.     The National Association for Stock Car Auto Racing ("NASCAR") is the sanctioning body for stock car motorsports racing based in Daytona Beach, Florida.[1]

---

[1] *NASCAR*, LINKEDIN, https://www.linkedin.com/company/nascar/ (last visited Aug. 6, 2025).

3.     As such, Defendant stores a litany of highly sensitive personal identifiable information ("PII") about its customers and current and former employees. But Defendant lost control over that data when cybercriminals infiltrated its insufficiently protected computer systems in a data breach (the "Data Breach").

4.     From on or about March 31, 2025 to on or about April 3, 2025, Defendant was hacked by a cybercriminal group. In other words, NASCAR had no effective means to prevent, detect, stop, or mitigate breaches of its systems—thereby allowing cybercriminals unrestricted access to its customers' and current and former employees' PII for *4 days*.

5.     On information and belief, cybercriminals were able to breach NASCAR's systems because Defendant failed to adequately train its employees on cybersecurity and failed to maintain reasonable security safeguards or protocols to protect the Class's PII. In short, NASCAR's failures placed the Class's PII in a vulnerable position—rendering it an easy target for cybercriminals.

6.     Plaintiff is a Data Breach victim, being a former employee of Defendant. He brings this class action on behalf of himself and all others harmed by NASCAR's misconduct.

7.     The exposure of one's PII to cybercriminals is a bell that cannot be unrung. Before this data breach, its customers and current and former employees private information was exactly that—private. Not anymore. Now, their private information is forever exposed and unsecure.

**PARTIES**

8.    Plaintiff, Keaton Hargett, is a natural person and citizen of Keller, Texas, where he intends to remain.

9.    Defendant, is Delaware limited liability company that maintains its principal place of business at 1 Daytona Boulevard, Daytona Beach, Florida, 32114.

## JURISDICTION AND VENUE

10.    This Court has subject matter jurisdiction over this action under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2). The amount in controversy exceeds $5 million, exclusive of interest and costs. NASCAR and Plaintiff are citizens of different states. And there are over 100 putative Class members.

11.    This Court has personal jurisdiction over NASCAR because it is headquartered in Florida, regularly conducts business in Florida, and has sufficient minimum contacts in Florida.

12.    Venue is proper in this Court because NASCAR's principal office is in this District, and because a substantial part of the events, acts, and omissions giving rise to Plaintiff's claims occurred in this District.

## BACKGROUND

### NASCAR Collected and Stored the PII of Plaintiff and the Class

13.    NASCAR states it is "is the sanctioning body for the No. 1 form of motorsports in the United States and owner of 14 of the nation's major motorsports

entertainment facilities."[2] NASCAR sanctions more than 1,200 races annually in 11 countries and more than 30 U.S. states and has more than 5000 employees.[3]

14.    As part of its business, NASCAR receives and maintains the PII of thousands of its customers and current and former employees.

15.    In collecting and maintaining the PII, NASCAR agreed it would safeguard the data in accordance with its internal policies, state law, and federal law. After all, Plaintiff and Class members themselves took reasonable steps to secure their PII.

16.    Under state and federal law, businesses like NASCAR have duties to protect its customers and current and former employees PII and to notify them about breaches.

17.    NASCAR recognizes these duties, declaring in its "Privacy Statement" that  it has "put in place technical, organizational, and administrative procedures designed to help prevent unauthorized access to or use of your Information, and to maintain the security of the NDM Network Services and the Information."[4]

18.    Despite recognizing its duty to do so, on information and belief, Defendant has not implemented reasonably cybersecurity safeguards or policies to protect its customers and current and former employees PII or supervised its IT or data security agents and employees to prevent, detect, and stop breaches of its systems. As

---

[2] *Id.*
[3] *Id.*
[4] *NASCAR Digital Media Network Privacy Statement*, NASCAR, https://www.nascar.com/ndmnetworkprivacystatement/ (last visited Aug. 6, 2025).

a result, Defendant leaves significant vulnerabilities in its systems for cybercriminals to exploit and gain access to the PII in its care.

*NASCAR's Data Breach*

19.    According to the letter[5] Defendant sent various state Attorney's General (the "Breach Notice"), on or about April 3, 2025, Defendant "identified and immediately began addressing a security incident that involved unauthorized access to [its] network."[6]

20.    Defendant states it launched an investigation, which concluded on June 24, 2025.[7] Defendant's investigation revealed that between March 31, 2025 and April 3, 2025, an "unauthorized actor acquired certain files on [Defendant's] network."[8] In other words, cybercriminals not only accessed the PII in Defendant's care but also *stole* this data.

21.    Due to the obfuscating nature of Defendant's Breach Notice, it is unclear how many individuals were affected by the Data Breach or what types of PII were involved in the Data Breach; however, on information and belief, the exfiltrated files contained names and Social Security numbers.[9]

---

[5] Defendant's Breach Notice is attached hereto as **Exhibit A**.
[6] Ex. A.
[7] *Id.*
[8] *Id.*
[9] Ionut Arghire, *NASCAR Confirms Personal Information Stolen in Ransomware Attack*, SECURITY WEEK (July 28, 2025), https://www.securityweek.com/nascar-confirms-personal-information-stolen-in-ransomware-attack/.

22.     And yet, according to information Defendant's submitted to the Office of the Maine Attorney General,[10] NASCAR waited until July 24, 2025, before it began notifying some victims about the Data Breach—more than three months after the Data Breach began and a month after Defendant's "investigation" came to an end.  Notice is ongoing, with many breach victims, including Plaintiff, yet to receive individual notice.

23.     Thus, NASCAR kept the Class in the dark—thereby depriving the Class of the opportunity to try and mitigate their injuries in a timely manner.

24.     And when NASCAR did notify some entities about the Data Breach, NASCAR acknowledged that the Data Breach created a present, continuing, and significant risk of suffering identity theft, encouraging Plaintiff and the Class to "be vigilant for incidents of fraud or identity theft by reviewing your account statements and free credit reports for any unauthorized activity."[11]

25.     Since the breach, Defendant claims that it has taken "steps to enhance the security of our network environment."[12]

26.     But such simple declarations are insufficient to ensure that Plaintiff's and Class Members' PII will be protected from additional exposure in a subsequent data breach.

---

[10] *Data Breach Notifications*, OFFICE OF THE MAINE ATTORNEY GENERAL, https://www.maine.gov/agviewer/content/ag/985235c7-cb95-4be2-8792-a1252b4f8318/dff3c2fa-cf00-4967-9715-22dbe34996a1.html (last visited Aug. 6, 2025).
[11] Ex. A.
[12] *Id*.

27.     NASCAR failed its duties when its inadequate security practices caused the Data Breach. In other words, NASCAR's negligence is evidenced by its failure to prevent the Data Breach and stop cybercriminals from accessing the PII. And thus, NASCAR caused widespread injury and monetary damages.

28.     Worryingly, cybersecurity firms who track dark web activity have reported that the hacker group "Medusa" has taken credit for the Data Breach.[13]

29.     Medusa is a ransomware gang that, according to the United States' Cybersecurity and Infrastructure Security Agency ("CISA"), operates a double extortion model, where an organization's files are encrypted and *exfiltrated* to Medusa's servers.[14] Organizations then must pay to decrypt the stolen files and prevent their release.[15]

30.     CISA further advises that Medusa has expanded to an "affiliate model" where affiliates, referred to as "Medusa actors," use the group's software to attack organizations and take a cut of the resulting extortion payments.[16]

---

[13] *National Association for Stock Car Auto Racing*, BREACHSENSE, https://www.breachsense.com/breaches/national-association-for-stock-car-auto-racing-data-breach/ (last visited Aug. 6, 2025).
[14] *#StopRansomware: Medusa Ransomware,* CISA (Mar. 12, 2025), https://www.cisa.gov/news-events/cybersecurity-advisories/aa25-071a.
[15] *Id.*
[16] *Id.*

31.    On or around April 8, 2025, Medusa created a post on its dark web website[17] indicating that it had hacked Defendant and stolen PII from its computer network.[18]



32.    Medusa's post contained a countdown clock displaying "10 days, 21 hours, 28 minutes and 58 seconds" indicating that Medusa would publish the PII it

---

[17] The screen shot regarding the dark web post related to the Data Breach was obtained from the X (formally Twitter) account of Ransom DB, a website providing dark web and ransomware updates in real time. *See Home Page*, Ransom DB, https://www.ransom-db.com/ (last visited Aug. 6, 2025).

[18] @Ransom-DB, Twitter (X) (July 28, 2025, 10:41 AM) https://x.com/Ransom_DB/status/1949857660922212753.

stole from Defendant if a ransom payment was not made. The post also contained links entitled "Add time 1 day," "Delete All Data" and "Download data now!" with dollar amounts below them, indicting that one could pay to add time to the countdown clock, delete the stolen PII. or download it.

33.    Defendant has not made any public statements on whether it made a ransom payment to Medusa related to the Data Breach.

34.    Thus, on information and belief, Plaintiff's and Class Members' PII has already been published, or will be published imminently, on the dark web.

35.    Moreover, even if NASCAR made a ransom payment, there is no guarantee that the data Medusa stole will be deleted.[19] The stolen PII is valuable, and can easily be sold to another threat actor, so there is little incentive to delete it.[20] As the CISA advisory indicated *supra*, Medusa advertises the sale of the data it steals to anyone willing to pay concurrently with its ransom demands.

36.    In addition, according to the CISA advisory, FBI investigations identified that after paying the ransom, one victim was contacted by a separate Medusa actor who claimed the negotiator had stolen the ransom amount already paid and requested half of the payment be made again to provide the "true decryptor."[21] This indicates that the "Medusa actors" will not abide by Medusa's promises not to disclose

---

[19] Steve Adler, *Majority of Ransomware Victims That Pay a Ransom Suffer a Second Attack*, THE HIPAA JOURNAL (Feb. 23, 2024), https://www.hipaajournal.com/majority-of-ransomware-victims-that-pay-a-ransom-suffer-a-second-attack/.
[20] *Id*.
[21] N. 13.

an organization's data after a ransom payment has been made.

37.     Further, there have been cases where the links that lead to compromised files, while removed from the group who received the ransom payment's dark web website, remain available on the servers used by other hackers, even after the demand is met.[22]

38.     Cybercriminal groups can monetize stolen PII and sell it on the dark web as part of a full identity profile.[23] Buyers can then use that information to conduct different types of identity theft or fraud, such as filing a fake tax return, applying for a fraudulent mortgage or opening a bank account while impersonating the victim.[24]

39.     To date, on information and belief, Defendant has not notified Plaintiff and Class Members about the theft of their PII by Medusa, leaving them vulnerable to identity theft and fraud.

40.     As a result of NASCAR's omissions, Plaintiff's and Class Members' ability to mitigate the harms resulting from the Data Breach has been severely impaired.

41.     Upon information and belief, the Medusa cybercriminal group was able to: (1) defeat Defendant's security systems, (2) gain access to its network and gain

---

[22] *Dedicated Leak Sites (DLS): Here's what you should know*, Group-IB, https://www.group-ib.com/resources/knowledge-hub/dedicated-leak-sites/ (last visited Apr. 22, 2025).

[23] Anthony M. Freed, *Which Data Do Ransomware Attackers Target for Double Extortion?*, MALICIOUSLIFE BY CYBEREASON, https://www.cybereason.com/blog/which-data-do-ransomware-attackers-target-for-double-extortion (listed visited Mar. 6, 2025).

[24] *Id.*

access to the sensitive PII contained therein, and (3) successfully steal Plaintiff's and the Class's PII.

42.    And as the Harvard Business Review notes, such "[c]ybercriminals frequently use the Dark Web—a hub of criminal and illicit activity—to sell data from companies that they have gained unauthorized access to through credential stuffing attacks, phishing attacks, [or] hacking."[25]

43.    And as the Harvard Business Review notes, such "[c]ybercriminals frequently use the Dark Web—a hub of criminal and illicit activity—to sell data from companies that they have gained unauthorized access to through credential stuffing attacks, phishing attacks, [or] hacking."[26]

***Plaintiff's Experiences and Injuries***

44.    Plaintiff Keaton Hargett is a Data Breach victim, having worked for NASCAR from 2022 to 2023.

45.    Thus, on information and belief, NASCAR obtained and maintained Plaintiff's PII.

46.    As a result, Plaintiff was injured by NASCAR's Data Breach.

---

[25] Brenda R. Sharton, *Your Company's Data Is for Sale on the Dark Web. Should You Buy It Back?*, HARVARD BUS. REV. (Jan. 4, 2023) https://hbr.org/2023/01/your-companys-data-is-for-sale-on-the-dark-web-should-you-buy-it-back.

[26] Brenda R. Sharton, *Your Company's Data Is for Sale on the Dark Web. Should You Buy It Back?*, HARVARD BUS. REV. (Jan. 4, 2023) https://hbr.org/2023/01/your-companys-data-is-for-sale-on-the-dark-web-should-you-buy-it-back.

47.    As a condition of receiving employment from Defendant, Plaintiff provided NASCAR with his PII and allowed it to maintain his PII. NASCAR used Plaintiff's PII to facilitate his employment and run its business.

48.    Plaintiff trusted that NASCAR would use reasonable measures to protect his PII according to NASCAR's internal policies, as well as state and federal law. NASCAR obtained and continues to maintain Plaintiff's PII and has a continuing legal duty and obligation to protect that PII from unauthorized access and disclosure.

49.    Plaintiff reasonably understood that a portion of the funds derived from his employment would be used to pay for adequate cybersecurity and protection of PII.

50.    Plaintiff is unaware of whether he has experienced another data breach, other than the Data Breach at issue here.

51.    In the aftermath of the Data Breach, Plaintiff has experienced unauthorized charges that were made to his financial account. Plaintiff was forced to spend time reviewing his statements, disputing the charges, cancelling the affected card, and ordering a new card. Plaintiff estimates he spent 2 to 3 hours addressing the fraud that occurred because of the Data Breach.

52.    Thus, on information and belief, Plaintiff's PII has already been published by Medusa or other cybercriminals on the dark web.

53.    On information and belief, through its Data Breach, NASCAR compromised at least Plaintiff's name and Social Security number.

54.    Plaintiff has spent—and will continue to spend—significant time and effort monitoring her accounts to protect himself from identity theft and signing up for credit monitoring services. After all, NASCAR directed Plaintiff to take those steps in its breach notice.

55.    Plaintiff fears for the security of his PII and worries about what information was exposed in the Data Breach.

56.    Because of NASCAR's Data Breach, Plaintiff has suffered—and will continue to suffer from—anxiety, sleep disruption, stress, fear, and frustration. Such injuries go far beyond allegations of mere worry or inconvenience. Rather, Plaintiff's injuries are precisely the type of injuries that the law contemplates and addresses.

57.    Plaintiff suffered actual injury from the exposure and theft of his PII—which violates his rights to privacy.

58.    Plaintiff suffered imminent and impending injury arising from the substantially increased risk of fraud, misuse, and medical identity theft—all because NASCAR's Data Breach placed Plaintiff's PII right in the hands of criminals.

59.    Indeed, following the Data Breach, Plaintiff has experienced a dramatic uptick in scam and phishing calls and text messages. On information and belief, Plaintiff's phone number was stolen by Medusa in the Data Breach.

60.    Because of the Data Breach, Plaintiff anticipates spending considerable amounts of time and money to try and mitigate his injuries.

61. Today, Plaintiff has a continuing interest in ensuring that his PII—which, upon information and belief, remains backed up in NASCAR's possession—is protected and safeguarded from additional breaches.

***Plaintiff and the Proposed Class Face Significant Risk of Continued Identity Theft***

62. Because of NASCAR's failure to prevent the Data Breach, Plaintiff and Class members suffered—and will continue to suffer—damages. These damages include, *inter alia*, monetary losses, lost time, anxiety, and emotional distress. Also, they suffered or are at an increased risk of suffering:

    a.    loss of the opportunity to control how their PII is used;

    b.    diminution in value of their PII;

    c.    compromise and continuing publication of their PII;

    d.    out-of-pocket costs from trying to prevent, detect, and recovery from identity theft and fraud;

    e.    lost opportunity costs and wages from spending time trying to mitigate the fallout of the Data Breach by, *inter alia*, preventing, detecting, contesting, and recovering from identify theft and fraud;

    f.    delay in receipt of tax refund monies;

    g.    unauthorized use of their stolen PII; and

    h.    continued risk to their PII—which remains in NASCAR's possession—and is thus as risk for futures breaches so long as NASCAR fails to take appropriate measures to protect the PII.

63.     Stolen Sensitive Information is one of the most valuable commodities on the criminal information black market. According to Experian, a credit-monitoring service, stolen PII alone can be worth up to $1,000.00 depending on the type of information obtained.

64.     The value of Plaintiff's and the Class's Sensitive Information on the black market is considerable. Stolen Sensitive Information trades on the black market for years, and criminals frequently post stolen Sensitive Information openly and directly on various "dark web" internet websites, making the information publicly available, for a substantial fee of course.

65.     It can take victims years to spot identity theft, giving criminals plenty of time to use that information to commit acts of identity theft and fraud.

66.     One such example of criminals using Sensitive Information for profit is the development of "Fullz" packages.

67.     Cyber-criminals can cross-reference two sources of Sensitive Information to marry unregulated data available elsewhere to criminally stolen data with an astonishingly complete scope and degree of accuracy in order to assemble complete dossiers on individuals. These dossiers are known as "Fullz" packages.

68.     The development of "Fullz" packages means that stolen Sensitive Information from the Data Breach can easily be used to link and identify it to Plaintiff and the proposed Class's phone numbers, email addresses, and other unregulated sources and identifiers. In other words, even if certain information such as emails, phone numbers, or credit card numbers may not be included in the Sensitive

Information stolen by the cyber-criminals in the Data Breach, criminals can easily create a Fullz package and sell it at a higher price to unscrupulous operators and criminals (such as illegal and scam telemarketers) over and over. That is exactly what is happening to Plaintiff and members of the proposed Class, and it is reasonable for any trier of fact, including this Court or a jury, to find that Plaintiff's and the Class's stolen Sensitive Information is being misused, and that such misuse is fairly traceable to the Data Breach.

69.    Defendant disclosed the Sensitive Information of Plaintiff and the Class for criminals to use in the conduct of criminal activity. Specifically, Defendant opened up, disclosed, and exposed the Sensitive Information of Plaintiff and the Class to people engaged in disruptive and unlawful business practices and tactics, including online account hacking, unauthorized use of financial accounts, and fraudulent attempts to open unauthorized financial accounts (i.e., identity fraud), all using the stolen Sensitive Information.

70.    Defendant's failure to properly notify Plaintiff and members of the Class of the Data Breach exacerbated Plaintiff's and the Class's injury by depriving them of the earliest ability to take appropriate measures to protect their Sensitive Information and take other necessary steps to mitigate the harm caused by the Data Breach.

*NASCAR Knew—Or Should Have Known—of the Risk of a Data Breach*

71.    NASCAR's data security obligations were particularly important given the substantial increase in cyberattacks and/or data breaches in recent years.

72.    In 2021, a record 1,862 data breaches occurred, exposing approximately

293,927,708 sensitive records—a 68% increase from 2020.[27]

73.    Indeed, cyberattacks have become so notorious that the Federal Bureau of Investigation ("FBI") and U.S. Secret Service issue warnings to potential targets, so they are aware of, and prepared for, a potential attack. As one report explained, "[e]ntities like smaller municipalities and hospitals are attractive to ransomware criminals . . . because they often have lesser IT defenses and a high incentive to regain access to their data quickly."[28]

74.    Cyberattacks on organizations like Defendant have become extremely notorious in recent years, with firms suffering more than 130 data breaches, exposing 38 million records, in 2022.  Further, since 2020, US businesses that specialize in manufacturing and utilities have suffered 973 data breaches affecting more than 202 million records.

75.    Therefore, the increase in such attacks, and attendant risk of future attacks, was widely known to the public and to any large organization, including Defendant.

*NASCAR Failed to Follow FTC Guidelines*

76.    According to the Federal Trade Commission ("FTC"), the need for data security should be factored into all business decision-making.  Thus, the FTC issued

---

[27] *See 2021 Data Breach Annual Report*, IDENTITY THEFT RESOURCE CENTER (Jan. 2022) https://notified.idtheftcenter.org/s/.
[28] Ben Kochman, *FBI, Secret Service Warn of Targeted Ransomware*, LAW360 (Nov. 18, 2019), https://www.law360.com/articles/1220974/fbi-secret-service-warn-of-targeted-ransomware.

numerous guidelines identifying best data security practices that businesses—like Defendant—should use to protect against unlawful data exposure.

77.   In 2016, the FTC updated its publication, *Protecting Personal Information: A Guide for Business*. There, the FTC set guidelines for what data security principles and practices businesses must use.[29]  The FTC declared that, *inter alia*, businesses must:

a.   protect the personal customer information that they keep;

b.   properly dispose of personal information that is no longer needed;

c.   encrypt information stored on computer networks;

d.   understand their network's vulnerabilities; and

e.   implement policies to correct security problems.

78.   The guidelines also recommend that businesses watch for the transmission of large amounts of data out of the system—and then have a response plan ready for such a breach.

79.   Furthermore, the FTC explains that companies must:

a.   not maintain information longer than is needed to authorize a transaction;

b.   limit access to sensitive data;

c.   require complex passwords to be used on networks;

d.   use industry-tested methods for security;

---

[29] *Protecting Personal Information: A Guide for Business,* FEDERAL TRADE COMMISSION (Oct. 2016) https://www.ftc.gov/system/files/documents/plain-language/pdf-0136_proteting-personal-information.pdf.

     e.    monitor for suspicious activity on the network; and

     f.    verify that third-party service providers use reasonable security measures.

80.    The FTC brings enforcement actions against businesses for failing to protect customer data adequately and reasonably. Thus, the FTC treats the failure—to use reasonable and appropriate measures to protect against unauthorized access to confidential consumer data—as an unfair act or practice prohibited by Section 5 of the Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 45. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

81.    In short, NASCAR's failure to use reasonable and appropriate measures to protect against unauthorized access to its current and former clients' (and their patients' and customers') data constitutes an unfair act or practice prohibited by Section 5 of the FTCA, 15 U.S.C. § 45.

***NASCAR Failed to Follow Industry Standards***

82.    Several best practices have been identified that—at a *minimum*—should be implemented by businesses like Defendant. These industry standards include: educating all employees; strong passwords; multi-layer security, including firewalls, anti-virus, and anti- malware software; encryption (making data unreadable without a key); multi-factor authentication; backup data; and limiting which employees can access sensitive data.

83.     Other industry standard best practices include: installing appropriate malware detection software; monitoring and limiting the network ports; protecting web browsers and email management systems; setting up network systems such as firewalls, switches, and routers; monitoring and protection of physical security systems; protection against any possible communication system; and training staff regarding critical points.

84.     Upon information and belief, NASCAR failed to implement industry-standard cybersecurity measures, including failing to meet the minimum standards of both the NIST Cybersecurity Framework Version 2.0 (including without limitation PR.AA-01, PR.AA.-02, PR.AA-03, PR.AA-04, PR.AA-05, PR.AT-01, PR.DS-01, PR-DS-02, PR.DS-10, PR.PS-01, PR.PS-02, PR.PS-05, PR.IR-01, DE.CM-01, DE.CM-03, DE.CM-06, DE.CM-09, and RS.CO-04).

85.     These frameworks are applicable and accepted industry standards. And by failing to comply with these accepted standards, NASCAR opened the door to the criminals—thereby causing the Data Breach.

## CLASS ACTION ALLEGATIONS

86.     Plaintiff brings this class action under Fed. R. Civ. P. 23(a), 23(b)(2), and 23(b)(3), individually and on behalf of all members of the following class:

> All individuals residing in the United States whose PII was compromised in Defendant's Data Breach including all those individuals who received notice of the breach.

87.     Excluded from the Class are Defendant, its agents, affiliates, parents, subsidiaries, any entity in which NASCAR has a controlling interest, any NASCAR

officer or director, any successor or assign, and any Judge who adjudicates this case, including their staff and immediate family.

88.    Plaintiff reserves the right to amend the class definition.

89.    Certification of Plaintiff's claims for class-wide treatment is appropriate because Plaintiff can prove the elements of her claims on class-wide bases using the same evidence as would be used to prove those elements in individual actions asserting the same claims.

90.    Ascertainability. All members of the proposed Class are readily ascertainable from information in NASCAR's custody and control. After all, NASCAR already identified some individuals and sent them data breach notices.

91.    Numerosity. The Class members are so numerous that joinder of all Class members is impracticable. Upon information and belief, the proposed Class includes thousands of members.

92.    Typicality. Plaintiff's claims are typical of Class members' claims as each arises from the same Data Breach, the same alleged violations by Defendant, and the same unreasonable manner of notifying individuals about the Data Breach.

93.    Adequacy. Plaintiff will fairly and adequately protect the proposed Class's common interests. His interests do not conflict with Class members' interests. And Plaintiff has retained counsel—including lead counsel—that is experienced in complex class action litigation and data privacy to prosecute this action on the Class's behalf.

94.    <u>Commonality and Predominance</u>. Plaintiff's and the Class's claims raise predominantly common fact and legal questions—which predominate over any questions affecting individual Class members—for which a class wide proceeding can answer for all Class members. In fact, a class wide proceeding is necessary to answer the following questions:

a.    if NASCAR had a duty to use reasonable care in safeguarding Plaintiff's and the Class's PII;

b.    if NASCAR failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information compromised in the Data Breach;

c.    if NASCAR were negligent in maintaining, protecting, and securing PII;

d.    if NASCAR breached contract promises to safeguard Plaintiff and the Class's PII;

e.    if NASCAR took reasonable measures to determine the extent of the Data Breach after discovering it;

f.    if NASCAR's Breach Notice was reasonable;

g.    if the Data Breach caused Plaintiff and the Class injuries;

h.    what the proper damages measure is; and

i.    if Plaintiff and the Class are entitled to damages, treble damages, and or injunctive relief.

95.  <u>Superiority.</u> A class action will provide substantial benefits and is superior to all other available means for the fair and efficient adjudication of this controversy.  The damages or other financial detriment suffered by individual Class members are relatively small compared to the burden and expense that individual litigation against NASCAR would require. Thus, it would be practically impossible for Class members, on an individual basis, to obtain effective redress for their injuries. Not only would individualized litigation increase the delay and expense to all parties and the courts, but individualized litigation would also create the danger of inconsistent or contradictory judgments arising from the same set of facts. By contrast, the class action device provides the benefits of adjudication of these issues in a single proceeding, ensures economies of scale, provides comprehensive supervision by a single court, and presents no unusual management difficulties.

**<u>FIRST CAUSE OF ACTION</u>**
**Negligence**
**(On Behalf of Plaintiff and the Class)**

96.  Plaintiff incorporates by reference paragraphs 1–95 as if fully set forth herein.

97.  Plaintiff and the Class entrusted their PII to NASCAR on the premise and with the understanding that NASCAR would safeguard their PII, use their PII to provide services only, and/or not disclose their PII to unauthorized third parties.

98.  NASCAR owed a duty of care to Plaintiff and Class members because it was foreseeable that NASCAR's failure—to use adequate data security in accordance

with industry standards for data security—would compromise their PII in a data breach. And here, that foreseeable danger came to pass.

99.    NASCAR has full knowledge of the sensitivity of the PII and the types of harm that Plaintiff and the Class could and would suffer if their PII was wrongfully disclosed.

100.    NASCAR owed these duties to Plaintiff and Class members because they are members of a well-defined, foreseeable, and probable class of individuals whom NASCAR knew or should have known would suffer injury-in-fact from NASCAR's inadequate security practices. After all, NASCAR actively sought and obtained Plaintiff and Class members' PII.

101.    NASCAR owed—to Plaintiff and Class members—at least the following duties to:

> a.    exercise reasonable care in handling and using the PII in its care and custody;
>
> b.    implement industry-standard security procedures sufficient to reasonably protect the information from a data breach, theft, and unauthorized;
>
> c.    promptly detect attempts at unauthorized access;
>
> d.    notify Plaintiff and Class members within a reasonable timeframe of any breach to the security of their PII.

102.    Thus, NASCAR owed a duty to timely and accurately disclose to Plaintiff and Class members the scope, nature, and occurrence of the Data Breach.

After all, this duty is required and necessary for Plaintiff and Class members to take appropriate measures to protect their PII, to be vigilant in the face of an increased risk of harm, and to take other necessary steps to mitigate the harm caused by the Data Breach.

103.    NASCAR also had a duty to exercise appropriate clearinghouse practices to remove PII it was no longer required to retain under applicable regulations.

104.    NASCAR knew or reasonably should have known that the failure to exercise due care in the collecting, storing, and using of the PII of Plaintiff and the Class involved an unreasonable risk of harm to Plaintiff and the Class, even if the harm occurred through the criminal acts of a third party.

105.    NASCAR's duty to use reasonable security measures arose because of the special relationship that existed between NASCAR and Plaintiff and the Class. That special relationship arose because Plaintiff and the Class entrusted NASCAR with their confidential PII, a necessary part of obtaining services from Defendant.

106.    Under the FTC Act, 15 U.S.C. § 45, NASCAR had a duty to use fair and adequate computer systems and data security practices to safeguard Plaintiff and Class members' PII.

107.    Section 5 of the FTC Act prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair act or practice by businesses, such as Defendant, of failing to use reasonable measures to protect the PII entrusted to it. The FTC publications and orders promulgated pursuant

to the FTC Act also form part of the basis of NASCAR's duty to protect Plaintiff and the Class members' sensitive PII.

108.   NASCAR violated its duty under Section 5 of the FTC Act by failing to use reasonable measures to protect PII and not complying with applicable industry standards as described in detail herein. NASCAR's conduct was particularly unreasonable given the nature and amount of PII NASCAR had collected and stored and the foreseeable consequences of a data breach, including, specifically, the immense damages that would result to individuals in the event of a breach, which ultimately came to pass.

109.   Similarly, under HIPAA, NASCAR had a duty to follow HIPAA standards for privacy and security practices—as to protect Plaintiff's and Class members' PII.

110.   NASCAR violated its duty under HIPAA by failing to use reasonable measures to protect its PII and by not complying with applicable regulations detailed *supra*. Here too, NASCAR's conduct was particularly unreasonable given the nature and amount of PII that NASCAR collected and stored and the foreseeable consequences of a data breach, including, specifically, the immense damages that would result to individuals in the event of a breach, which ultimately came to pass.

111.   The risk that unauthorized persons would attempt to gain access to the PII and misuse it was foreseeable. Given that NASCAR hold vast amounts of PII, it was inevitable that unauthorized individuals would attempt to access NASCAR's databases containing the PII —whether by malware or otherwise.

112.    PII is highly valuable, and NASCAR knew, or should have known, the risk in obtaining, using, handling, emailing, and storing the PII of Plaintiff and Class members' and the importance of exercising reasonable care in handling it.

113.    NASCAR improperly and inadequately safeguarded the PII of Plaintiff and the Class in deviation of standard industry rules, regulations, and practices at the time of the Data Breach.

114.    NASCAR breached these duties as evidenced by the Data Breach.

115.    NASCAR acted with wanton and reckless disregard for the security and confidentiality of Plaintiff's and Class members' PII by:

    a.    disclosing and providing access to this information to third parties and

    b.    failing to properly supervise both the way the PII was stored, used, and exchanged, and those in its employ who were responsible for making that happen.

116.    NASCAR breached its duties by failing to exercise reasonable care in supervising its agents, contractors, vendors, and suppliers, and in handling and securing the personal information and PII of Plaintiff and Class members which actually and proximately caused the Data Breach and Plaintiff and Class members' injury.

117.    NASCAR further breached its duties by failing to provide reasonably timely notice of the Data Breach to Plaintiff and Class members, which actually and

proximately caused and exacerbated the harm from the Data Breach and Plaintiff and Class members' injuries-in-fact.

118.   NASCAR has admitted that the PII of Plaintiff and the Class was wrongfully lost and disclosed to unauthorized third persons because of the Data Breach.

119.   As a direct and traceable result of NASCAR's negligence and/or negligent supervision, Plaintiff and Class members have suffered or will suffer damages, including monetary damages, increased risk of future harm, embarrassment, humiliation, frustration, and emotional distress.

120.   And, on information and belief, Plaintiff's PII has already been published—or will be published imminently—by cybercriminals on the Dark Web.

121.   NASCAR's breach of its common-law duties to exercise reasonable care and its failures and negligence actually and proximately caused Plaintiff and Class members actual, tangible, injury-in-fact and damages, including, without limitation, the theft of their PII by criminals, improper disclosure of their PII, lost benefit of their bargain, lost value of their PII, and lost time and money incurred to mitigate and remediate the effects of the Data Breach that resulted from and were caused by NASCAR's negligence, which injury-in-fact and damages are ongoing, imminent, immediate, and which they continue to face.

## SECOND CAUSE OF ACTION
### Breach of Implied Contract
### (On Behalf of Plaintiff and the Class)

122.   Plaintiff incorporates by reference paragraphs 1–95 as if fully set forth herein.

123.   Plaintiff and Class members were required to provide their PII to NASCAR as a condition of receiving services or employment provided by Defendant. Plaintiff and Class members provided their PII to NASCAR in exchange for NASCAR's services or employment.

124.   Plaintiff and Class members reasonably understood that a portion of the funds they paid NASCAR, or a portion of the funds derived from their employment, would be used to pay for adequate cybersecurity measures.

125.   Plaintiff and Class members reasonably understood that NASCAR would use adequate cybersecurity measures to protect the PII that they were required to provide based on NASCAR's duties under state and federal law and its internal policies.

126.   Plaintiff and the Class members accepted NASCAR's offers by disclosing their PII to NASCAR in exchange for services or in exchange for employment.

127.   In turn, and through internal policies, NASCAR agreed to protect and not disclose the PII to unauthorized persons.

128.   In its Privacy Policy, NASCAR represented that it had a legal duty to protect Plaintiff's and Class Member's PII.

129.   Implicit in the parties' agreement was that NASCAR would provide Plaintiff and Class members with prompt and adequate notice of all unauthorized access and/or theft of their PII.

130.    After all, Plaintiff and Class members would not have entrusted their PII to NASCAR in the absence of such an agreement with Defendant.

131.    Plaintiff and the Class fully performed their obligations under the implied contracts with Defendant.

132.    The covenant of good faith and fair dealing is an element of every contract. Thus, parties must act with honesty in fact in the conduct or transactions concerned. Good faith and fair dealing, in connection with executing contracts and discharging performance and other duties according to their terms, means preserving the spirit—and not merely the letter—of the bargain. In short, the parties to a contract are mutually obligated to comply with the substance of their contract in addition to its form.

133.    Subterfuge and evasion violate the duty of good faith in performance even when an actor believes their conduct to be justified. Bad faith may be overt or consist of inaction. And fair dealing may require more than honesty.

134.    NASCAR materially breached the contracts it entered with Plaintiff and Class members by:

a.    failing to safeguard their PII;

b.    failing to notify them promptly of the intrusion into its computer systems that compromised such information.

c.    failing to comply with industry standards;

d.    failing to comply with the legal obligations necessarily incorporated into the agreements; and

e.  failing to ensure the confidentiality and integrity of the electronic PII that NASCAR created, received, maintained, and transmitted.

135.   In these and other ways, NASCAR violated its duty of good faith and fair dealing.

136.   NASCAR's material breaches were the direct and proximate cause of Plaintiff's and Class members' injuries (as detailed *supra*).

137.   And, on information and belief, Plaintiff's PII has already been published—or will be published imminently—by Medusa or by other cybercriminals on the dark web.

138.   Plaintiff and Class members performed as required under the relevant agreements, or such performance was waived by NASCAR's conduct.

### THIRD CAUSE OF ACTION
**Invasion of Privacy**
**(On Behalf of Plaintiff and the Class)**

139.   Plaintiff incorporates by reference paragraphs 1–95 as if fully set forth herein.

140.   Plaintiff and the Class had a legitimate expectation of privacy regarding their highly sensitive and confidential PII and were accordingly entitled to the protection of this information against disclosure to unauthorized third parties.

141.   NASCAR owed a duty to its customers and to its current and former employees, including Plaintiff and the Class, to keep this information confidential.

142.   The unauthorized acquisition (i.e., theft) by a third party of Plaintiff and Class members' PII is highly offensive to a reasonable person.

143.    The intrusion was into a place or thing which was private and entitled to be private. Plaintiff and the Class disclosed their sensitive and confidential information to Defendant, but did so privately, with the intention that their information would be kept confidential and protected from unauthorized disclosure. Plaintiff and the Class were reasonable in their belief that such information would be kept private and would not be disclosed without their authorization.

144.    The Data Breach constitutes an intentional interference with Plaintiff's and the Class's interest in solitude or seclusion, either as to their person or as to their private affairs or concerns, of a kind that would be highly offensive to a reasonable person.

145.    NASCAR acted with a knowing state of mind when it permitted the Data Breach because it knew its information security practices were inadequate.

146.    NASCAR acted with a knowing state of mind when it failed to notify Plaintiff and the Class in a timely fashion about the Data Breach, thereby materially impairing their mitigation efforts.

147.    Acting with knowledge, NASCAR had notice and knew that its inadequate cybersecurity practices would cause injury to Plaintiff and the Class.

148.    As a proximate result of NASCAR's acts and omissions, the private and sensitive PII of Plaintiff and the Class were stolen by a third party and is now available for disclosure and redisclosure without authorization, causing Plaintiff and the Class to suffer damages (as detailed *supra*).

149.    And, on information and belief, Plaintiff's PII has already been published—or will be published imminently—by Medusa or by other cybercriminals on the dark web.

150.    Unless and until enjoined and restrained by order of this Court, NASCAR's wrongful conduct will continue to cause great and irreparable injury to Plaintiff and the Class since their PII are still maintained by NASCAR with their inadequate cybersecurity system and policies.

151.    Plaintiff and the Class have no adequate remedy at law for the injuries relating to NASCAR's continued possession of their sensitive and confidential records. A judgment for monetary damages will not end NASCAR's inability to safeguard the PII of Plaintiff and the Class.

152.    In addition to injunctive relief, Plaintiff, on behalf of himself and the other Class members, also seeks compensatory damages for NASCAR's invasion of privacy, which includes the value of the privacy interest invaded by Defendant, the costs of future monitoring of their credit history for identity theft and fraud, plus prejudgment interest and costs.

**FOURTH CAUSE OF ACTION**
**Unjust Enrichment**
**(On Behalf of Plaintiff and the Class)**

153.    Plaintiff incorporates by reference paragraphs 1–95 as if fully set forth herein.

154.    This claim is pleaded in the alternative to the breach of implied contract claim.

155. Plaintiff and Class members conferred a benefit upon Defendant. After all, NASCAR benefitted from using their PII to provide services and benefitted from the payment or employment provided in exchange for the PII.

156. NASCAR appreciated or had knowledge of the benefits it received from Plaintiff and Class members.

157. Plaintiff and Class members reasonably understood that NASCAR would use adequate cybersecurity measures to protect the PII that they were required to provide based on NASCAR's duties under state and federal law and its internal policies.

158. NASCAR enriched itself by saving the costs they reasonably should have expended on data security measures to secure Plaintiff's and Class members' PII.

159. Instead of providing a reasonable level of security, or retention policies, that would have prevented the Data Breach, NASCAR instead calculated to avoid its data security obligations at the expense of Plaintiff and Class members by utilizing cheaper, ineffective security measures. Plaintiff and Class members, on the other hand, suffered as a direct and proximate result of NASCAR's failure to provide the requisite security.

160. Under principles of equity and good conscience, NASCAR should not be permitted to retain the full value of Plaintiff's and Class members' payment because NASCAR failed to adequately protect their PII.

161. Plaintiff and Class members have no adequate remedy at law.

162.   NASCAR should be compelled to disgorge into a common fund—for the

benefit of Plaintiff and Class members—all unlawful or inequitable proceeds that it

received because of its misconduct.

**FIFTH CAUSE OF ACTION**
**Breach of Fiduciary Duty**
**(On Behalf of Plaintiff and the Class)**

163.   Plaintiff incorporates by reference paragraphs 1–95 as if fully set forth

herein.

164.   Given the relationship between NASCAR and Plaintiff and Class

members, where NASCAR became guardian of Plaintiff's and Class members' PII,

NASCAR became a fiduciary by its undertaking and guardianship of the PII, to act

primarily for Plaintiff and Class members, (1) for the safeguarding of Plaintiff and

Class members' PII; (2) to timely notify Plaintiff and Class members of a Data Breach

and disclosure; and (3) to maintain complete and accurate records of what information

(and where) NASCAR did and does store.

165.   NASCAR has a fiduciary duty to act for the benefit of Plaintiff and Class

members upon matters within the scope of NASCAR's relationship with them—

especially to secure their PII.

166.   Because of the highly sensitive nature of the PII, Plaintiff and Class

members would not have entrusted Defendant, or anyone in NASCAR's position, to

retain their PII had they known the reality of NASCAR's inadequate data security

practices.

167.   NASCAR breached its fiduciary duties to Plaintiff and Class members by failing to sufficiently encrypt or otherwise protect Plaintiff's and Class members' PII.

168.   NASCAR also breached its fiduciary duties to Plaintiff and Class members by failing to diligently discover, investigate, and give notice of the Data Breach in a reasonable and practicable period.

169.   As a direct and proximate result of NASCAR's breach of its fiduciary duties, Plaintiff and Class members have suffered and will continue to suffer numerous injuries (as detailed *supra*).

## PRAYER FOR RELIEF

Plaintiff and Class members respectfully request judgment against NASCAR and that the Court enter an order:

A.   Certifying this case as a class action on behalf of Plaintiff and the proposed Class, appointing Plaintiff as class representative, and appointing her counsel to represent the Class;

B.   Awarding declaratory and other equitable relief as necessary to protect the interests of Plaintiff and the Class;

C.   Awarding injunctive relief as necessary to protect the interests of Plaintiff and the Class;

D.   Enjoining NASCAR from further unfair and/or deceptive practices;

E.   Awarding Plaintiff and the Class damages including applicable compensatory, exemplary, punitive damages, and statutory damages, as allowed by law;

F.    Awarding restitution and damages to Plaintiff and the Class in an amount to be determined at trial;

G.    Awarding attorneys' fees and costs, as allowed by law;

H.    Awarding prejudgment and post-judgment interest, as provided by law;

I.    Granting Plaintiff and the Class leave to amend this complaint to conform to the evidence produced at trial; and

J.    Granting other relief that this Court finds appropriate.

### DEMAND FOR JURY TRIAL

Plaintiff demands a jury trial for all claims so triable.

Date: August 11, 2025          Respectfully submitted,

By: */s/ Mariya Weekes*
Mariya Weekes (FL State Bar No. 56299)
**MILBERG COLEMAN BRYSON**
**PHILLIPS GROSSMAN, PLLC**
333 SE 2nd Avenue, Suite 2000
Miami, FL 33131
Tel: (786) 879-8200 / Fax: (786) 879-7520
mweekes@milberg.com

Raina Borrelli*
**STRAUSS BORRELLI, PLLC**
980 N. Michigan Avenue, Suite 1610
Chicago, Illinois 60611
T: (872) 263-1100
F: (872) 263-1109
raina@straussborrelli.com

*Pro hac vice forthcoming*

*Attorneys for Plaintiff and Proposed Class*